# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) Case No.: 2:16-cr-939-PMD |
| | ) |
| v. | ) |
| | ) **ORDER** |
| Lamar Meyers, | ) |
| | ) |
| Defendant. | ) |

This matter is before the Court on Defendant Lamar Meyers' motion to suppress (ECF No. 39). For the following reasons, the Court denies the motion.

## FACTS

On the night of April 18, 2016, Donald Moultrie was driving his wife's SUV on Sam Rittenberg Boulevard, one of Charleston's largest and busiest streets. Meyers was in the front passenger's seat. City of Charleston Police Department officer Christopher Wycoff, who was patrolling the area, saw the SUV being operated without its taillights illuminated. Wycoff activated his marked car's blue lights to pull over the SUV. Moultrie turned into a gas station. The station's parking lot had several open spaces, but Moultrie drove slowly past them to an area beyond the station's convenience store, by its dumpster. Wycoff, who had worked as a Charleston police officer for several years[1] and who had received training on traffic stops and drug interdiction, found it unusual for a driver being pulled over to pass several obvious places to stop.

As Moultrie was parking, Wycoff followed behind. He could see Moultrie and Meyers moving around inside the SUV. They continued to move around after Moultrie parked. Wycoff had learned in his training that when both occupants of a car being stopped are noticeably moving around, it indicates the occupants are trying to conceal or reach for something.

---
1. Before joining Charleston's police department, Wycoff spent approximately seven years as an officer in Texas.

Wycoff's body camera captured most of his encounter with Moultrie and Meyers. Wycoff turned on the camera as he was reporting the SUV's license plate. He then approached the driver's window, which Moultrie had rolled down, and began talking with the two men. Wycoff started by introducing himself and telling Moultrie he had been driving with the SUV's lights off. Wycoff asked Moultrie for his vehicle registration, proof of insurance, and driver's license. Moultrie handed over a wad of papers, which did not include a license. While Moultrie was doing that, Meyers mentioned that he and Moultrie had been out drinking. Seeing no license in the paperwork Moultrie handed over, Wycoff asked again for the license. Moultrie said he thought it was in the back seat and began looking for it.

In the course of looking for his license, Moultrie picked up a water bottle from the floorboard and asked if he could throw it into the parking lot. When Wycoff told him not to do that, Meyers asked for permission to get out of the car. Wycoff told Meyers to "just sit tight," because the way he had seen the men moving around made him nervous. As Wycoff would later testify, he wanted to maintain control of the situation, for his safety, by keeping both men in his line of sight.

Wycoff asked Moultrie to provide some identification. Moultrie handed Wycoff an identification card. When Wycoff again asked for Moultrie's driver's license, Moultrie admitted that it had been suspended. Meyers did not have a license, either, but he handed Wycoff an identification card. As Meyers was producing his card, Wycoff noticed him sigh loudly. Wycoff then asked if the men were on parole. Moultrie was not, but Meyers acknowledged he was on probation for a prior drug conviction. Wycoff asked the men if they had "something you're not supposed to have." Moultrie and Meyers said they did not. Wycoff repeated his question, noting again that he had seen them moving around the car earlier. That time, Moultrie again said no, while avoiding Wycoff's eyes. Meyers said nothing but stared wide-eyed at Wycoff for several

2

seconds. Wycoff asked once more if the men had driver's licenses. When they again replied "no," Wycoff radioed for backup; he suspected at that point that there were drugs or weapons in the car.

After asking for backup, Wycoff questioned Meyers about his prior drug conviction. Meyers told him it was for crack cocaine, and that he had spent six years in prison for it. Sensing the men were "shaky," Wycoff asked them once more if they had anything they were not supposed to have. They both said no.

Wycoff then started talking with Moultrie about his criminal history. After Moultrie said that he had not been convicted before of driving under suspension, Wycoff paused the conversation for a moment to call in a request for a canine unit. Wycoff and Moultrie then continued talking until Meyers leaned over in his seat with some fast food bags he had been clutching in his hands. Wycoff told Meyers not to reach under his seat. Meyers sat up, placed the bags on the dashboard, and put up his hands, saying he did not want to get shot. Wycoff told Meyers that reaching under the seat made him (Wycoff) nervous—it was a safety issue—but there was no need for Meyers to keep his hands up. After several seconds of silence, Meyers offered that "there ain't nothing in the car." Wycoff resumed questioning Moultrie, who said that he had a court date coming up for another incident of driving under suspension and that his prior arrest record was "pretty clean," with an arrest about twenty years earlier.

Shortly after that, Officer Beaver arrived and walked up to Meyers' window. At Wycoff's request, Moultrie rolled it down. Wycoff then told Moultrie to get out of the car. As Moultrie did so, he said he was looking for his money; Wycoff pointed out that Moultrie was holding money in his hand. They then went to the back of the SUV, where Wycoff asked if Moultrie had anything on him that would poke Wycoff in a pat-down. Moultrie said he had a syringe in his pocket because he was a diabetic. Wycoff found the syringe from Moultrie's pocket, filled with what Moultrie claimed was water. Wycoff, however, believed the syringe contained heroin. Wycoff

3

asked Moultrie again when he was last arrested. This time, Moultrie said he had been arrested two weeks ago. Wycoff then told Moultrie to be honest with him and asked once more if there was anything illegal in the SUV. Moultrie responded that "[t]here's nothing on my side" but that Meyers had a gun in his front pocket.

By that point, Officer Bradish had arrived with a drug dog. Wycoff told Bradish that Meyers had a gun. Wycoff then returned to the SUV, where Meyers was still seated, and told him to put his hands on his head and get out of the car. Once Meyers did so, Beaver and Bradish began patting down Meyers' pants and lifting up his shirt for several seconds. As they did so, Wycoff asked Meyers if he had any weapons; Meyers said he did not. Wycoff handcuffed Meyers and then took over the frisk, focusing on Meyers' front pants pockets. After several more seconds, Wycoff asked him if he had anything illegal; Meyers again denied that. Feeling what he thought were drugs in Meyers' pocket, Wycoff reached in and found a folded $50 bill that felt like it had something inside it. Wycoff believed it was cocaine.

Wycoff continued to pat down Meyers' waistline and pockets. He then stopped and asked Beaver to check the SUV for the gun. Beaver did not find anything, so Wycoff began frisking Meyers again. Between Meyers' legs, Wycoff felt what he believed to be a gun and said "it's in his pants." Meyers offered to get the gun out himself. Wycoff refused and positioned Meyers to face him. In that position, Meyers was also facing Beaver and Bradish, as well as the area between the gas station's pumps and its convenience store. Several patrons were walking in that area, at distances of twenty to thirty feet from Meyers and the officers.

Wycoff put on a latex glove, unbuckled Meyers' belt, and opened the fly on Meyers' pants. Meyers was wearing gym shorts under his pants, and underwear under those shorts. Wycoff pulled Meyers' pants and shorts out away from Meyers' body and then began to reach inside the shorts with his gloved hand. As Wycoff did so, Meyers said, "It's in the drawers." After confirming that

4

with Meyers, Wycoff pulled Meyers' underwear out from his waist, exposing Meyers' genitals—at least to Wycoff's body camera—for several seconds. Wycoff then pulled Meyers' underwear and shorts back up and, with his gloved hand, reached inside the underwear without pulling it or the shorts away from Meyers' body again. Wycoff paused to put a glove on his other hand and then resumed his search, using one hand to hold Meyers' underwear in place and the other to get the gun. Within another ten seconds, Wycoff had retrieved a pistol from between Meyers' legs.

After Wycoff finished searching Meyers, he unfolded the $50 bill he had found in Meyers' pocket. Wycoff found a substance inside that was determined to be heroin.

A federal grand jury indicted Meyers with possessing heroin, *see* 21 U.S.C. § 844(a), and possessing a firearm after a felony conviction, *see* 18 U.S.C. § 922(g). Meyers filed his motion to suppress on June 9, 2017. The Government responded on July 19. On July 25, the Court held a hearing on Meyers' motion. Wycoff testified, and the Government offered several exhibits, including footage of the stop from Wycoff's body camera.

## DISCUSSION

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Whren v. United States*, 517 U.S. 806, 809 (1996). Meyers contends the police violated that reasonableness requirement in several respects. The Court addresses each issue *seriatim*.

**I.  Detaining Meyers**

Meyers contends that stopping Moultrie's car in the first place was unlawful, that Wycoff lacked a reasonable suspicion to order Meyers to "sit tight" in the car, and that Wycoff extended the stop without reasonable suspicion that other criminal activity was afoot.

### A. The Initial Stop

The Fourth Amendment forbids unreasonable traffic stops. *Whren*, 517 U.S. at 810. "[T]he decision to stop an automobile is reasonable where police have probable cause to believe that a traffic violation has occurred." *Id.* In South Carolina, it is a misdemeanor to drive without taillights on more than thirty minutes after sunset. S.C. Code Ann. § 56-5-4450. Wycoff stopped the car when he saw it driving two hours after sunset without its taillights illuminated. He thus had probable cause to initiate the stop. *See United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) ("Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop.").

### B. The "Sit Tight" Command

About one minute after Wycoff approached the car, Meyers asked if he could get out of the car. Wycoff told him to "just sit tight" because he and Moultrie were making him nervous by the way they had been "moving all around" in the car. Meyers argues Wycoff lacked a reasonable suspicion that Meyers was engaged in criminal conduct and thus lacked the authority to order him to stay in the car.

The Court need not decide the premise of Meyers' argument; it agrees with the Government that generalized safety concerns justified the command. The temporary seizure of a passenger during a traffic stop is presumptively reasonable for the duration of the stop. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). That rule stems from the recognition that traffic stops are fraught with the danger of passengers using violence to prevent police officers from uncovering other crimes during traffic stops and that such danger can be minimized by letting officers "exercise unquestioned command of the situation." *Id.* at 330–31 (quoting *Maryland v. Wilson*, 519 U.S. 408, 414 (1997)). Consequently, officers have the power to detain passengers in traffic stops even

without a particularized suspicion that the passenger may be dangerous or engaged in criminal activity. The Fourth Circuit has held this power includes the authority to order a passenger to stay in a car. *United States v. Walker*, 575 F. App'x 146, 148 (4th Cir. 2014) (per curiam); *accord York v. City of Burlington*, 225 F. Supp. 3d 341, 349 (M.D.N.C. 2016); *Coffey v. Morris*, 401 F. Supp. 2d 542, 546 (W.D. Va. 2005).

Meyers counters that the Supreme Court has not directly addressed the issue at hand and that *Wilson* supports his position. In *Wilson*, the Supreme Court held officers may order passengers to get out of cars because the public interest—namely, avoiding the well-known danger of passenger-initiated harm to police officers—greatly outweighs the minimal additional intrusion on personal liberty such orders cause. 519 U.S. at 413–15. In reaching its conclusion, the Supreme Court pointed out that, "[o]utside the car, the passengers will be denied access to any possible weapon that might be concealed in the interior of the passenger compartment." *Id.* at 414. Seizing on that observation, Meyers insists it shows that if Officer Wycoff was concerned about danger, he should have let Meyers out of the car.

Meyers' own case shows why his reliance on *Wilson* is misplaced. While ordering a passenger out of a car may makes it harder to get to weapons *inside* the car, it does not reduce a passenger's access to weapons hidden under his clothes. To the contrary, it would have been easier for Meyers to retrieve the gun from his underwear while standing and with the car at least partially blocking Wycoff's view of him; sitting in the passenger's seat, he had no real ability to get the gun without Wycoff seeing him and beating Meyers to the draw. Thus, that one sentence from *Wilson* does not make Wycoff's command unreasonable.

In fact, other parts of *Wilson* support the Government's position. In *Wilson*, the Supreme Court relied heavily on its decision in *Michigan v. Summers*, 452 U.S. 692 (1981), which involved police executing a warrant to search Summers' house for drugs. When the police got to the house,

7

they found Summers walking down his steps, and they ordered him to go back inside while they searched. *Id.* at 695. The Supreme Court found that order permissible because the inherent danger of violence in such searches can be minimized if officers "routinely exercise unquestioned command of the situation." *Id.* at 702–03. The Court in *Wilson* quoted that reasoning, finding it to be analogous to the traffic stop at issue in that case. *Wilson*, 519 U.S. at 414. If *Summers* is analogous to *Wilson*, it is all the more so here; just as in *Summers*, this case involves ordering the defendant to be inside a location, rather than to leave it. In any event, the principle running through *Johnson*, *Walker*, *Wilson*, and *Summers*—"unquestioned command" in the interest of safety—is present here.

## C. The Duration and Scope of the Stop

Meyers contends Wycoff exceeded the scope and duration of the traffic stop without having a reasonable suspicion that Meyers or Moultrie was engaged in criminal activity. He argues Wycoff did so by asking questions unrelated to the stop, such as how long Meyers had spent in prison on his previous narcotics conviction. Meyers also points out that Wycoff separately called for backup and a drug dog within minutes of approaching the car, that Wycoff never tried to obtain information about Moultrie from dispatch, that Wycoff positioned another officer outside Meyers' window, and that more than several minutes passed before Wycoff ordered Moultrie out of the car. The Court disagrees that Wycoff exceeded his authority.

A lawful traffic stop "begins when a vehicle is pulled over for investigation of a traffic violation" and ends "when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." *Johnson*, 555 U.S. at 333. During the stop, an officer may "conduct safety-related checks that do not bear directly on the reasons for the stop, such as requesting a driver's license and vehicle registration, or checking for criminal records and outstanding arrest warrants." *United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016).

However, he "cannot investigate a matter outside the scope of the initial stop unless he receives the motorist's consent or develops reasonable, articulable suspicion of ongoing criminal activity." *Id.* at 649–50 (citation and internal quotation marks omitted).

Wycoff's belief that something more than a taillight violation was afoot began before the SUV stopped. He observed both Moultrie and Meyers moving suspiciously inside the car, and he watched as Moultrie slowly drove past a number of places where he could have parked. Within the first minute of Wycoff approaching the SUV, Moultrie had done three unusual things: hand over a stack of paperwork instead of requested documents, tell Wycoff he thought his license was in the back seat, and ask Wycoff if he could litter in front of the officer. Meyers, too, had taken an unusual step by asking to leave. Just over a minute after that, Wycoff then knew that Moultrie had lied about having a driver's license and that neither Moultrie nor Meyers had one. By that point, the character of the stop had changed significantly. It had moved beyond a taillight issue to a fairly conclusive case of driving under suspension and a situation where there was no one available to drive the car. The stop could no longer be reasonably wrapped up in a matter of minutes. That expanded timeframe allowed Wycoff more time to question Moultrie and Meyers without unduly prolonging the length of the stop. *See United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008) (stating officer may detain a driver beyond the scope of the lawful traffic stop if the officer "possess[es] a justification for doing so other than the initial traffic violation that prompted the stop in the first place"). During that time, he had the right to question Moultrie and Meyers about matters unrelated to the taillight issue, or even to Moultrie's driving under suspension. *See United States v. Mason*, 628 F.3d 123, 131 (4th Cir. 2010) (stating officer may question both the driver and passengers regarding matters unrelated to the traffic stop, as long as "the unrelated questioning does not extend the encounter beyond the period reasonably necessary to effectuate the purposes of the lawful detention"). Thus, the Court disagrees with Meyers'

argument that Wycoff exceeded the scope of the stop by questioning him and Moultrie for several minutes.

Wycoff ordered Moultrie out of the car less than six minutes after their encounter began. At that point, Moultrie had acted oddly, he had lied to Wycoff about his license, Moultrie had averted his eyes while answering Wycoff's questions about the presence of contraband, and the SUV had four air fresheners hanging from the rearview mirror. *See United States v. Foreman*, 369 F.3d 776, 785 (4th Cir. 2004) (stating presence of air fresheners on rearview mirror supported reasonable suspicion because they are "commonly used to mask the smell of narcotics"). In addition, after Meyers nervously put his hands up, he blurted out, without additional questioning, "there ain't nothing in the car." These facts, in combination, were enough to give Wycoff reasonable suspicion to order Moultrie out of the car and pat him down.

In that pat-down, Wycoff obtained a syringe of what he was told, but doubted, was water. In his experience, he had not encountered diabetics who inject water, and they tend to carry test strips along with syringes. Wycoff also obtained information—an unambiguous statement from a car's driver about his passenger—that Meyers had a gun in his front pocket. At that point, Wycoff had reasonable suspicion to order Meyers out of the car for a frisk. Wycoff did so immediately; Meyers was out of the car less than nine minutes after Wycoff turned on his body camera. The Court sees no unlawful extension of the traffic stop in these facts.

Nor does it see any unlawfulness in the facts Meyers cites. Wycoff requested backup and the drug dog only after he had seen several things that were making him nervous and suspicious and after he had confirmed that neither Moultrie nor Meyers could legally drive away. As for checking Moultrie's background, Wycoff *did* initiate that process by calling in the SUV's license plate. He did that before he began speaking with Moultrie and Meyers. Finally, the fact that Wycoff called a drug dog is immaterial. Having a drug dog arrive and sniff around the car does

10

not unlawfully prolong or exceed the scope of the traffic stop as long as the sniff occurs during the time reasonably needed to complete the stop. *United States v. Green*, 740 F.3d 275, 280 (4th Cir. 2014). Wycoff requested the dog three minutes after he approached Moultrie and Meyers; the dog arrived five minutes later. If actually having a sniff performed does not transform the situation, the preliminary step of simply requesting for a dog to come to the scene does not, either.

## II. Searching Meyers

Over the course of several minutes, police frisked and searched various parts of Meyers' person. Meyers frames that course of events as two separate sets of frisks and searches.

### A. Reasonable Suspicion to Frisk; Probable Cause to Search

Meyers argues the police lacked a reasonable suspicion to frisk him and then lacked probable cause to search him. The Court disagrees. Officers conducting traffic stops may frisk passengers "upon reasonable suspicion that they may be armed and dangerous." *Johnson*, 555 U.S. at 332 (citation and quotation marks omitted). As discussed above, Wycoff had a reasonable suspicion to frisk Meyers. Among other things, Moultrie had told Wycoff that Meyers was armed and where to look for a gun.

Meyers characterizes Moultrie's statement as an informant's uncorroborated tip, and he contends that, as such, it is insufficient to create reasonable suspicion. The Court disagrees. Moultrie made the statement to Wycoff in person. *See United States v. Christmas*, 222 F.3d 141, 144 (4th Cir. 2000) (stating informants who report tips face-to-face are "more trustworthy and reliable than [an] anonymous tip[ster]" because law enforcement can hold the informant accountable for false statements). Moultrie made that statement based on what was likely a recent personal observation—seeing Meyers with the gun just minutes earlier while sitting right next to Meyers. Moreover, by that point, Wycoff had discovered a syringe on Moultrie and had not believed Moultrie's explanation that the syringe was filled with water. Finally, Wycoff had seen

11

that Meyers was moving around suspiciously while Moultrie was pulling over. That was more than enough to create reasonable suspicion to frisk Meyers.

In the course of frisking Meyers, Wycoff separately felt one item he believed to be drugs and another he believed to the gun Moultrie said Meyers had. Under the circumstances, feeling those objects gave Wycoff probable cause to search for them inside Meyers' clothes. *See Minnesota v. Dickerson*, 508 U.S. 366, 375–76 (1993).

## B. The Strip Search

Meyers argues the discovery of the gun was the product of an improper public strip search.[2] The Court disagrees.

Though different in character from other types of searches, the legality of a sexually invasive search of a person's body is still judged by its reasonableness. *See Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (stating that such searches are subject to the Fourth Amendment's prohibition on unreasonable searches). Courts decide whether such a search is reasonable in a particular case by weighing the need for the search against any invasion of personal rights that may result. *Id.* Courts must weigh those competing interests by looking at the search in its complete context and considering the following factors: (1) the place in which the search was conducted; (2) the scope of the particular intrusion; (3) the manner in which the search was conducted; and (4) the justification for initiating the search. *Bell*, 441 U.S. at 520.

The Fourth Circuit has not hesitated to condemn particularly egregious strip searches. *See, e.g.*, *United States v. Edwards*, 666 F.3d 877, 885 (4th Cir. 2011) (finding officers acted in unreasonable manner by using knife to cut off bag of crack tied around defendant's genitals where

---

2. The Government disputes Meyers' characterization of the search as a "strip search." This seems to be a matter of semantics; the conduct's label does not determine its legality. *See BNSF Ry. Co. v. U.S. Dep't of Transp.*, 566 F.3d 200, 208 (D.C. Cir. 2009) (noting the Fourth Amendment analysis "remains the same" irrespective of whether search is labeled as a strip search, or merely as a search), *cited in United States v. Edwards*, 666 F.3d 877, 882 (4th Cir. 2011). In any event, Meyers' characterization is accurate. *See Edwards*, 666 F.3d at 882 (stating "[a] suspect need not have been fully undressed for the search to have characteristics of, or be treated as, a strip search" and finding police strip-searched defendant by pulling his pants and underwear away from his waist and looking at his genitals).

nothing prevented officers for removing bag by less dangerous means); *Amaechi v. West*, 237 F.3d 356, 362 (4th Cir. 2001) (criticizing search of female victim who was subjected to the "public exposure, touching, and penetration of her genitalia and kneading of her buttocks during a search incident to arrest for a misdemeanor noise violation . . . where no security risk or threat of the concealment or destruction of evidence was present").

Meyers contends his search "is exactly the kind of search singled out in *Amaechi* as unreasonable." (Mot. Suppress, ECF No. 39, at 10.) The Court disagrees. As the Court will explain in its analysis of the *Bell* factors, *Amaechi* and *Edwards* (which Meyers does not cite) differ vastly from the facts at hand here. Rather, the facts here more closely resemble three cases in which the Fourth Circuit found public searches inside defendants' underwear reasonable under *Bell*. *See United States v. Simon*, 600 F. App'x 89 (4th Cir. 2015) (per curiam); *United States v. Madriz*, 532 F. App'x 353 (4th Cir. 2013) (per curiam); *United States v. Daniels*, 323 F. App'x 201 (4th Cir. 2009) (per curiam), *as corrected* (June 19, 2009).

### 1. Place Where the Search Was Conducted

"[W]hether a sexually invasive search is conducted in a private or a public setting is 'especially relevant' to [the] determination of reasonableness." *Edwards*, 666 F.3d at 883 (quoting *Polk v. Montgomery Cty.*, 782 F.2d 1196, 1201–02 (4th Cir. 1986)). The Fourth Circuit has "repeatedly emphasized the necessity of conducting a strip search in private." *Amaechi*, 237 F.3d at 364; *see also id.* (stating that, absent "clear justification or exigent circumstances, an officer is not allowed to strip an arrestee on a public street").

The general character of the search's site—for instance, a sidewalk, as opposed a windowless jail cell—certainly plays a role in the analysis. *See Amaechi*, 237 F.3d at 361 (pointing out search was conducted on a residential street, rather than in a holding cell). It is not, however, dispositive. Rather, the focus is on whether the search "could have been viewed by others, and

13

whether it was in fact viewed by others." *Edwards*, 666 F.3d at 883; *compare Daniels*, 323 F. App'x at 207 (finding search in defendant's underwear reasonable where, *inter alia*, there was no proof that defendant's body might have been exposed to the public; the search occurred at night, away from public road, and with "a phalanx of male officers surround[ing]" defendant during the search), *with Amaechi*, 237 F.3d at 361 (criticizing search that was subject to viewing by Amaechi's family, the public, and officers not conducting the search).

The record does not show that anyone other than the three police officers actually saw the strip search or Meyers' genitals. There is evidence that other people did see that the officers were surrounding Meyers and searching him. The search occurred in the parking lot of a well-lit gas station next to a six-lane boulevard. The video from Officer Wycoff's body camera shows patrons, at a distance, getting gas and going in and out of the convenience store. It also shows one of the officers shining a flashlight on Meyers' groin during the search, including the time that Meyers' genitals are visible from Officer Wycoff's vantage point. However, the search occurred at night, the gas station's patrons appear to have been at least thirty feet away, and the officers stood between Meyers and the patrons. Although these circumstances do not completely negate the possibility that the public could have seen Meyers' genitals while they were briefly exposed, that possibility is quite low, and it is even less likely that any patron in fact saw Meyers exposed.

This factor tends to favor Meyers. That, however, does not conclusively show the search was unreasonable; the Court must still consider the other factors. *Cf. Madriz*, 532 F. App'x at 355 (finding strip search conducted "along the busy Baltimore–Washington Parkway in the afternoon" was nonetheless reasonable because the other three *Bell* factors favored the government).

### 2. The Scope of the Intrusion

"Public exposure of the genitalia accompanied by physical touching is far more intrusive than directing an arrestee to remove her clothing in private for the purpose of 'visually inspecting'

14

the arrestee's genitalia." *Amaechi*, 237 F.3d at 363; *see also id.* at 363–64 ("Physical penetration of the genitalia, no matter how slight, is an intrusion into the arrestee's body cavity and is the ultimate invasion of personal dignity."). However, a court's inquiry on this factor goes beyond simply identifying what areas of the defendant's body were exposed, touched, or both and then quantifying the degree of intrusiveness involved in the search of those areas. Rather, the court should also consider why the officer searched those areas and whether the officer needed to intrude as far as he did. *See Amaechi*, 237 F.3d at 363 (recognizing that in *United States v. Dorlouis*, 107 F.3d 248, 256 (4th Cir. 1997), the Fourth Circuit had equated "an unconstitutional strip search" with "an unnecessarily intrusive search"). In other words, the bigger question is whether the breadth and depth of the intrusion were reasonable. *See Madriz*, 532 F. App'x at 355 (finding the strip search reasonable specifically in scope, not just overall).

The answer to that question often depends on whether the officer had cause to believe the area the defendant's person he searched was harboring either evidence of a crime or something dangerous. For example, the plaintiff in *Amaechi* was arrested for a noise violation, a crime she could not possibly have concealed anywhere on or inside her body. 237 F.3d at 362. And because the officers arrested Amaechi while she was wearing a worn-out nightshirt that left most of her body—including intimate areas—exposed, they could have searched for weapons just by looking at her or, at most, by conducting a pat down. *Id.* at 362 n.12. Instead, one of the officers, having no suspicion at all that Amaechi had a weapon, proceeded directly to prodding her genitals and buttocks with his bare hand. *Id.* at 359, 362.

Contrast those egregious facts with *Madriz*. There, an officer frisking for drugs felt a foreign object near Madriz's groin. 532 F. App'x at 355. The officer targeted his subsequent search to that area, first checking the space between Madriz's pants and underwear and then proceeding inside Madriz's underwear only briefly. *Id.* The Fourth Circuit found the search

reasonable in scope because it was limited to where the officer had just detected something during the frisk. *Id.*; *see also Simon*, 600 F. App'x at 91 (finding officer properly limited intrusion to Simon's groin, the area where officer had detected an unknown object).

The intrusion here was reasonably limited in scope. Officer Wycoff initially focused on Meyers' front pocket area, where Moultrie had said the gun was located, and on the front of Meyers' waistline. Before Officer Wycoff proceeded any farther, he paused to have Officer Beaver see if the gun was inside the car. Only after that search proved fruitless did Officer Wycoff feel between Meyers' legs, where he quickly identified what felt like a gun. When Officer Wycoff felt the gun, he went straight to that area and nowhere else. However, like the officer in *Madriz*, Officer Wycoff proceeded incrementally. He first unbuttoned Meyers' pants and then pulled the pants and gym shorts out, rather than down, from Meyers' waist. He did not pull down or reach into Meyers' underwear until Meyers said the gun was "in the drawers." Although the search involved a considerable intrusion on Meyers' privacy, Officer Wycoff narrowly tailored the intrusion's breadth and depth by exposing and touching only an area where he had already detected a gun. This factor, therefore, heavily favors the Government.

### 3. The Manner in Which the Search Was Conducted

"[T]he reasonableness of a sexually intrusive search depends in part on the manner in which the search was conducted and the consideration given to the privacy interests of the suspect." *Edwards*, 666 F.3d at 884. "Some physical contact is permissible, and indeed unavoidable, when police reach into a suspect's pants to remove [contraband] the suspect has chosen to hide there." *Edwards*, 666 F.3d at 886 (citation and quotation marks omitted). However, the officer may not retrieve it "in a manner that poses an unnecessary risk of harm to the person being searched." *Id.* at 885. Along that line, the officer must not conduct the search "in a cruel, painful, or dangerous manner." *Id.* at 884; *see also id.* at 884–85 (stating defendant's trauma, pain, fear, and health risks

16

"are relevant in considering the reasonableness of the manner in which a sexually invasive search is conducted").

The search here was reasonable in manner. Officer Wycoff was cautious and calm, taking time to put on gloves and appearing to work gently and without any malice or cruelty. Nothing on the video indicated Meyers was in pain, that Officer Wycoff endangered Meyers' safety, or that he was threatening Meyers at all. Rather, Officer Wycoff worked quietly and methodically. *Cf. Simon*, 600 F. App'x at 91 (stating officer conducted search in "safe, nonthreatening manner"); *Madriz*, 532 F. App'x at 355 (stating officer "proceeded cautiously at every step of the search, and at no point did the search threaten Madriz's safety"). The record reveals no physical contact beyond the "unavoidable" amount *Edwards* allows.

Moreover, it appears the officers were attempting to accommodate Meyers' privacy. The officers stood between Meyers and the convenience store, and after a couple seconds of exposing Meyers' genitals, Officer Wycoff dropped Meyers' shirt back down and let Meyers' underwear back up, thus obscuring Meyers' genitals from view even on Officer Wycoff's body camera. *Cf. Madriz*, 532 F. App'x at 355 (officer pulled out defendant's underwear only briefly); *Daniels*, 323 F. App'x at 207 (defendant was exposed only momentarily and officers stood between defendant and road).

The search here therefore stands in sharp contrast to an officer taking a knife to a man's genitals just to get a bag of crack, when multiple safe alternatives were available. *Cf. Edwards*, 666 F.3d at 886. It also differs palpably from an officer bare-handedly groping a woman's buttocks and penetrating her genitals, while she stood virtually naked in front of her home, in the course of an apparently retaliatory arrest.[3] *Cf. Amaechi*, 237 F.3d at 361–62. This factor favors the Government.

---

3. In *Amaechi*, the officer who responded to the noise complaint told Amaechi he would not arrest her. 237 F.3d at 359. Two days later, however, he learned she had complained about his handling of the incident. *Id.* After he leaned of the complaint, he got a warrant to arrest her for the noise violation. *Id.*

17

### 4.      Justification for Initiating the Search

The Court finds the police were justified in performing the search at the gas station. Officer Wycoff had reliable information that Meyers was armed, and then he felt a gun located in a precarious spot. Moving Meyers to another site—or even a few feet—carried the risk that the gun could fire, harming Meyers, an officer, or a passerby. There was a clear danger to the safety of all involved and nearby, and the officers had no other safe option for trying to get the gun. This scenario strikes the Court as precisely the type of "exigent circumstances" that the Fourth Circuit has said would justify a public search. *Amaechi*, 237 F.3d at 364; *compare Daniels*, 323 F. App'x at 207 (finding officers were justified in searching underwear of defendant involved in drug distribution because the general connection between drugs and guns presented a legitimate danger to their safety), *with Edwards*, 666 F.3d at 886 (noting the government admitted there were no exigent circumstances requiring that the bag of drugs be removed while Edwards was on the street or that a knife be used to remove the bag).

In sum, the search was less than ideal, but so were the circumstances. The officers worked to protect Meyers' dignity while also protecting people—including Meyers—from physical harm. That substantial need for the search outweighed the invasion of Meyers' privacy, which the officers tried to minimize. Thus, the search was reasonable.

### **CONCLUSION**

For the foregoing reasons, the Court finds the police's actions in this case did not violate the Fourth Amendment. Therefore, it is **ORDERED** that Meyers' motion to suppress is **DENIED**.

**AND IT IS SO ORDERED.**

*[signature]*
PATRICK MICHAEL DUFFY
United States District Judge

**August 3, 2017**
**Charleston, South Carolina**